33

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK RONALD SHAYKIN,

     Petitioner,

V.                       No.  14-cv-13399-LJM-DRG

KENNETH ROMANOWSKI,      Hon. Laurie J. Michelson
                         Magistrate Judge David R. Grand

     Respondent.
------------------------------
Mark Ronald Shaykin 314630
Petitioner pro se
34625 26 Mile Road
New Haven, MI 48048
------------------------------
Timothy C. Erickson (P72071)
Assistant Attorney General
Counsel for Respondent
P O Box 30217
Lansing, MI 48909
------------------------------



FILED

MAY 2 1 2015

CLERK'S OFFICE
U.S. DISTRICT COURT

## PETITIONER'S REPLY TO RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

     Respondent moved for summary disposition, arguing that
Mr. Shaykin's habeas corpus petition was filed two days after
the statute of limitations expired. For the reasons more fully
set forth below, and in the brief in support of his habeas
petition which he incorporates by reference, Mr. Shaykin opposes
Respondent's motion and asks the Court to deny it.

I.   The Court should apply the federal mailbox rule of <u>Houston</u>
     <u>v. Lack</u> to the federal statute of limitations. That will
     not offend any state interest because Michigan has no
     statute of limitations on a motion for relief from judgment.3

II.  The Court should apply equitable tolling because the prison
     waited two business days before placing Mr. Shaykin's motion
     for relief from judgment into the outgoing mail. It arrived
     at the court the next day. Had they mailed it the day he
     gave it to them, it would have arrived at the court two
     days earlier, the same two days on which Respondent now
     relies to claim Mr. Shaykin's habeas petition is late..... 8

III.  The Court should toll the statute of limitations because Mr. Shaykin is actually innocent of the crimes of which he was convicted...................................... 10

IV.   The statute of limitations did not begin to run for Mr. Shaykin's habeas petition until he obtained the Exhibits that support his claims, which evidence was not available to Mr. Shaykin at the time of his trial or direct appeal. 23

FACTS

From the instant of his arrest, Mr. Shaykin has insisted that he committed no crime and that his accusers were not telling the truth (T 84-86). The trial court denied his request for an investigator and discovery. See Issue VII in the brief in support of his habeas petition.

During and after Mr. Shaykin's direct appeal, he did his best to investigate and collect evidence which his lawyers did not get that supports his claims of innocence and shows that the people who accused him were not telling the truth. It was slow tedious work to do this because he was seeking records from courts and law enforcement agencies in Michigan and Ohio. Some responded, some did not, and Michigan agencies would not provide anything because Michigan's Freedom of Information Act excludes prisoners. M.C.L. 15.231(2). The new evidence is included in the Exhibits supporting Mr. Shaykin's habeas petition. Petitioner's Exhibit 1, attached. As noted on page 1 of the Brief in Support of Mr. Shaykin's petition, all Exhibits in support of his habeas petition except 1, 2, 3, and 32, were not part of the record during Mr. Shaykin's trial and direct appeal.

When he had obtained what he believed to be sufficient

2

evidence to support his claims, Mr. Shaykin filed a motion for relief from judgment under M.C.R. 6.500, along with a motion to expand the record pursuant to M.C.R. 6.507. In his motion to expand the record, Mr. Shaykin explained the new evidence he had uncovered and asked the court to add it to the record, and he asked the court to order the production of other evidence which agencies and courts had been unwilling to provide. Petitioner's Exhibit 1, attached.

Mr. Shaykin mailed his motions to the trial court and county prosecutor using the Michigan Department of Corrections' Expedited Legal Mail service. The Disbursement Authorization Forms show the date and time Mr. Shaykin gave the mail to prison staff, and they show the date and time the prison staff placed it in the outgoing mail. The forms in this case show that Mr. Shaykin gave the trial court's and prosecutor's copies to staff on April 19, 2013. They show that the prosecutor's copy was placed in the outgoing mail on April 20, 2013, and the court's copy was not placed in the outgoing mail until April 21, 2013. Petitioner's Exhibits 1, 2, and 3.

I. The Court should apply the federal mailbox rule of <u>Houston v. Lack</u> to the federal statute of limitations. That will not offend any state interest because Michigan has no statute of limitations on a motion for relief from judgment.

The fact that Michigan does not apply the mailbox rule to motions for relief from judgment does not automatically foreclose this Court from doing so. Michigan has a mailbox rule

3

for papers in criminal cases where there are deadlines: 42 days for claims of appeal to the Court of Appeals, M.C.R. 7.204(A)(2)(e); 6 months applications for leave to appeal to the Court of Appeals, M.C.R. 7.205(A)(3); and 56 days for applications for leave to appeal to the Supreme Court, M.C.R. 7.302(C)(3). A motion for relief from judgment does not need a mailbox rule as far as Michigan courts are concerned because there is no deadline and thus it can never be untimely.

In Houston v. Lack, 487 U.S. 266, 276; 108 S.Ct. 2379, 2385; 101 L.Ed.2d 245 (1988), the Supreme Court held that a pro se prisoner's notice of appeal, required by F.R.A.P. 4(a) to be filed within 30 days after entry of the order or judgment appealed from, is "filed at the time petitioner delivered it to the prison authorities for forwarding to the court clerk." The Court noted the obvious, that pro se prisoners can "file" court papers "only by delivering them to prison authorities for forwarding to the appropriate" court.

In Moore v. Curley, U.S.D.C., E.D. Mich., No. 11-13451 (July 25, 2012) 2012 U.S.Dist.LEXIS 103508, Judge Lawson applied the federal mailbox rule to a Michigan prisoner's motion for relief from judgment under M.C.R. 6.500.

Where a state has not set a deadline for filing a post-conviction petition, and therefore has no reason to determine whether one is "timely," the Second, Seventh, and Ninth circuits apply the mailbox rule to determine when the federal statute of limitations is tolled.

In Fernandez v. Artuz, 402 F.3d 111 (2d Cir. 2005) the

4

federal court tolled the statute of limitations on the date the prisoner gave prison authorities his papers for mailing to the state court. If it had not done so, his habeas petition would have been ten days late. The court explained, "New York's rejection of the mailbox rule does not preclude its application by a _federal_ court in tolling a _federal_ statute of limitations." 402 F.3d, 115. It  pointed out that, like Michigan, New York has no deadline for post-conviction motions, so "New York State courts will never have occasion to decide whether the prison mailbox rule should apply ... Without a time limitation, a prisoner's state ... petition will always be timely regardless of whether it is delivered to prison authorities or received by the court. There is and can be no real conflict between state law and federal law where there is no state deadline for filing the petition that tolls the AEDPA limitations period." 402 F.3d, 116. Application of the federal mailbox rule for calculating a federal statute of limitations "evinces no disrespect for the competence of state courts, their procedures, or the stability of state verdicts. ... The rule already applies to a broad variety of state prisoner filings in federal actions; so it does not implicate new burdens on the state prison system. ... Applying the mailbox rule merely grants the full statute of limitations for pro se prisoners attempting to reach the courts." 402 F.3d, 115 fn3.

In _Ray v. Clements_, 700 F.3d 993, 1002-1005 (2012), Wisconsin argued that the mailbox rule should not apply because there is no deadline for filing a state post-conviction petition.

5

But the court noted that Wisconsin (like Michigan) recognizes a mailbox rule in other situations, citing Wis.Stat. §809.90(3)(e) (applying the mailbox rule to §808.10's 30 day deadline for seeking review in the state supreme court), and Nichols v. Litscher, 635 N.W.2d 292, 295-296 (Wis. 2001) (applying the mailbox rule to a state certiorari action). The court rejected the state's argument that the mailbox rule cannot apply where the state imposes no deadline. 700 F.3d, 1006.

In Anthony v. Cambra, 236 F.3d 568, 575-575 (9th Cir. 2000), the prisoner delivered his state petition to prison officials two days before the AEDPA deadline, but it did not reach the court until two days after the deadline and therefore, the government argued, did not stay the federal statute of limitations. The court held, "the mailbox rule applies with equal force to the filing of state as well as federal petitions, because at both times, the conditions that led to the adoption of the mailbox rule are present; the prisoner is powerless and unable to control the time of delivery of documents to the court." Id. (citations and internal quotations omitted).

The Sixth Circuit declined to apply the mailbox rule in a case where the State of Ohio imposed a 180-day deadline for filing a post-conviction petition. That case, Vroman v. Brigano, 346 F.3d 598 (6th Cir. 2003), is distinguishable from this one in important ways. There was a state court deadline for filing the motion. The petition arrived one day late, the trial court rejected it as untimely, and the state appellate courts denied relief on September 2, 1997. Vroman filed a motion for relief

6

from judgment and another round of appeals that ended in April 1999 and finally filed his habeas petition in November 1999. The court declined to apply the federal mailbox rule to the state court deadline, and it refused to apply equitable tolling because his habeas petition was filed more than one year after the federal statute of limitations expired. 346 F.3d, 605, 605 fn3.

The cases cited by Respondent are not relevant to this issue. Walker v. Department of Corrections, 222 Mich.App. 605 (1997), involved a prisoner's petition for judicial review of an MDOC administrative hearing decision. Michigan had no mailbox rule for those appeals in 1997, but the Supreme Court adopted one on February 25, 2010, M.C.R. 7.105. It was eliminated when M.C.R. Chapter 7.100 was revised in 2012. The order in People v. Lewis, 490 Mich. 967 (2011) held that the mailbox rule for Court of Appeals filings, M.C.R. 7.205(A)(3), which was adopted on February 25, 2010, applies to trial court orders entered on or after March 1, 2010. Neither case addresses the issue here.

The Supreme Court in Houston explained that reference to the prison mail log could easily determine the date a prisoner gave his papers to authorities for mailing. Here the Expedited Legal Mail Disbursement Forms document that Mr. Shaykin turned his papers in on April 19, 2013, which, by Respondent's calculation, gives Mr. Shaykin one day to spare. Exhibits 1, 2 and 3. The Court should follow Houston and Moore, Fernandez, Ray, and Anthony, and apply the mailbox rule here.

7

II. The Court should apply equitable tolling because the prison waited two business days before placing Mr. Shaykin's motion for relief from judgment into the outgoing mail. It arrived at the court the next day. Had they mailed it the day he gave it to them, it would have arrived at the court two days earlier, the same two days on which Respondent now relies to claim Mr. Shaykin's habeas petition is late.

Since at least 2002 the Sixth Circuit has held that the statute of limitations in 28 U.S.C. 2244(d)(1) is subject to equitable tolling to confer the benefit of the mailbox rule. Where a Michigan prisoner seeking review of his conviction gave his application for leave to appeal to the Michigan Supreme Court to prison authorities for mailing before it was due, and it arrived one day late, the Sixth Circuit applied equitable tolling. It considered the factors required for equitable tolling and concluded, "For these reasons, as well as the apparent justice in granting a state appellant the equitable benefit of the federally-accepted 'mailbox rule' for purposes of tolling a federal statute or limitations, we conclude that the statute of limitations should be equitably tolled in this case." White v. Curtis, 42 Fed. App'x. 698, 700 (6th Cir. 2002).

More recently, the Sixth Circuit applied equitable tolling where a court clerk's delay in docketing an application to the Michigan Supreme Court resulted in it being rejected as late. Quoting White, the court held that federal courts should treat the application as timely filed. "In so holding, we by no means dictate Michigan law to the Michigan courts. Rather, we apply our equitable powers to prevent inequity." Ross v. McKee, 465 Fed.App'x. 469, 476 (6th Cir. 2012).

In Holland v. Florida, -- U.S. --; 130 S.Ct. 2549, 2562;

177 L.Ed.2d 130 (2010), the Supreme Court held that the statute of limitations in 28 U.S.C.A. 2244(d)(1) is subject to equitable tolling. A petitioner must establish the same two elements the court adopted in Pace v. DeGuglielmo, 544 U.S. 408; 125 S.Ct. 1807, 1814; 161 L.Ed.2d 669 (2005): a litigant who seeks equitable tolling must establish: (1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstance stood in his way.

The elements adopted in Pace came from Irwin v. Department of Veterans Affairs, 498 U.S. 89; 111 S.Ct. 453; 112 L.Ed.2d. 435 (1990). In Irwin the Supreme Court explained, "Federal courts have typically extended equitable relief only sparingly. We have allowed equitable tolling in situations where the claimant has actively pursued his remedies by filing a defective pleading during the statutory period, or when the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." 111 S.Ct., 457-458.

Mr. Shaykin diligently pursued his investigation, prepared his motion, and used the Michigan Department of Corrections "Expedited Legal Mail" process to mail his motion for relief from judgment and supporting documents to the trial court and prosecutor. Exhibits 1, 2 and 3. Regular prisoner outgoing mail is put in the cellblock mailbox and taken to the mailroom the next day for placement in the outgoing mail. There is no log or receipt.

On the other hand, when a prisoner sends mail by the Expedited Legal Mail process, the staff member who receives

9

it takes it to the mailroom the same day for placement in the outgoing mail. The prisoner receives a dated receipt that shows the date he turned the mail in and the date it was placed in the outgoing mail.

Mr. Shaykin's papers to the state court and prosecutor were not placed in the outgoing mail the same day he turned them in. The prosecutor's copy of the motion was placed in outgoing mail at 1:00 p.m. the next afternoon, Exhibit 3, and the court's copy was not placed in outgoing mail until 8:45 a.m. the day after that. Exhibit 2. That the motion reached the court on the day after it was placed in outgoing mail is evidence that, had authorities mailed it when they received it two days earlier, it would have reached the court two days earlier. One who sees "Expedited Legal Mail" would reasonably think the mail will be "expedited" rather than delayed for two days.

Mr. Shaykin to his detriment relied on the Expedited Legal Mail system to operate as it was supposed to; Respondent must not be allowed to benefit from not operating its system properly. The Court should grant equitable tolling and hear the merits of Mr. Shaykin's petition.

III. The Court should toll the statute of limitations because Mr. Shaykin is actually innocent of the crimes of which he was convicted.

Actual innocence, if proved, serves as a gateway through which a federal habeas petitioner may pass if the statute of limitations has expired. The petitioner must show that, "in light of the new evidence, no juror, acting reasonably, would

10

have voted to find him guilty beyond a reasonable doubt."
McQuiggan v. Perkins, -- U.S. --; 133 S.Ct. 1924, 1928; --
L.Ed.2d -- (2013). McQuiggan followed Schlup v. Delo, 598 U.S.
298; 115 S.Ct. 851; 130 L.Ed.2d 808 (1995) and House v. Bell,
547 U.S. 518; 126 S.Ct. 2064; 165 L.Ed.2d 1 (2006), which allowed
habeas petitioners to overcome procedural default bars to federal
habeas by showing actual innocence.

Schlup requires that the petitioner present "new reliable
evidence ... that was not presented at trial." 115 S.Ct., 865.
The court explained, "under the gateway standard we describe
today, the newly presented evidence may indeed call into question
the credibility of the witnesses presented at trial. In such
a case, the habeas court may have to make some credibility
assessments." 115 S.Ct., 868. The district court "must assess
the probative force of the newly presented evidence in connection
with the evidence of guilt adduced at trial." 115 S.Ct., 869.
Schlup was convicted of murder while he was in prison. The issue
in his case was the credibility of two prison guards who
witnessed the murder and identified him as one of the killers.
In post-conviction proceedings, Schlup challenged their
credibility with sworn statements of other eyewitnesses who
said he was not involved, and two officers who saw him in the
dining room. Id.

In this case, Mr. Shaykin's new evidence - which consists
of police and court records that were not used at trial and
in most cases not discovered until after his appeal - challenges
the credibility of the state's star witness, Allen Oliver, as

well as witnesses Josh Snodderly, Ashley Clark, and Detectives Langford and Smith. The new evidence reveals a lack of credibility on these witnesses' part that makes it impossible for a jury to find Mr. Shaykin guilty beyond a reasonable doubt based on their word.

About 4:30 p.m. on June 17, 2007, Allen Oliver phoned police in Toledo, Ohio and told them Mr. Shaykin solicited Oliver and Josh Snodderly to kidnap Ashley Clark so Mr. Shaykin could kill her. Toledo police met with Oliver and Snodderly about 5:00 p.m. and arrested Mr. Shaykin 15 to 20 minutes later near the scene of the alleged abduction (T 69, 70, 72-73).

Oliver's credibility was crucial. He supplied details that Snodderly did not. Snodderly described Oliver as "the cat that brought the whole thing together. He was the one who knew [Mr. Shaykin], who met him, who brought me into the scene. He was the one that kinda came up with the whole thing ..." (PE 72). At trial, Snodderly described Oliver as "the con that puts it all together" (T 104). Defense counsel told the jury that the prosecution's case came down to whether jurors believed Oliver and Snodderly (T 218). During deliberations, jurors requested transcripts of Oliver's and Snodderly's testimony. Counsel agreed to give them the transcript of Oliver's preliminary examination testimony that had been read during the trial, and the court told them they could not have Snodderly's because it had not been transcribed (T 257-258).

New evidence shows that Allen Oliver was not credible.

Evidence not presented at trial shows that Oliver was not

trustworthy. He rarely made a court appearance unless he was in custody. Oliver was indicted on March 28, 2000 for kidnapping and rape. Exhibits 19 and 19A. Released on bond, he failed to appear for trial on September 5, 2000. Exhibit 4, pp 5-6. After his capture, he pled guilty and was sentenced to prison. Exhibit 19B. He was also charged and pled guilty to felony failure to appear. Exhibit 12 and 12A. The judgments in both cases held that Oliver was "not amenable to community control." Exhibits 12A and 19B.

Oliver paroled from the Ohio prison in April 2005. He absconded from his placement in October 2005 through January 2006. Released again, he absconded from March 2006 until his capture in July 2006. Released yet again, he absconded in January 2007 until his capture in May 2007. Exhibit 8. In the meantime, on April 25, 2007, the Lucas County Ohio Grand Jury indicted Oliver for failure to register as a sex offender. Exhibit 13, Exhibit 7, page 14. On May 14, 2007, Oliver was released on bond on a drug charge from Toledo Municipal Court. He had been arrested and charged under his alias, "Joseph Boss." Exhibits 8 and 8A. On May 17, 2007, Oliver was released on bond on the failure to register charge. Exhibit 7, page 13. By May 28, 2007 he had again absconded from his bond and parole placement. In the meantime, on May 30, 2007, Oliver entered a plea of not guilty by reason of insanity in the failure to register as a sex offender case. Exhibit 14.

On June 8, 2007, Oliver's mother reported his absence to the sheriff and to his parole officer, and on June 12, 2007

13

she wrote to the judge to request revocation of his bond. Exhibit 8. Oliver appears to have remained at large until June 17, 2007, when he phoned Toledo Police to accuse Mr. Shaykin of the crimes in this case. When police went to investigate, they arrested Oliver. Exhibit 22, page 6. He told them, "I'll testify for y'all cause look, I gotta go to court coming up pretty soon anyways." Exhibit 22, page 1. Police took Oliver's statement and released him.

On June 20, 2007 Detective Johnson subpoenaed Oliver to testify against Mr. Shaykin at the Ohio Grand Jury on June 27, 2007. Oliver did not appear to testify. Exhibits 9 through 11.

Oliver failed to appear in court on his drug case on June 25, 2007. From the docket he appears to have been captured later that day and released on bond again the following day. Exhibit 7, page 2, and Exhibit 8A. On July 23, 2007, he failed to appear in court on his failure to register case. Exhibit 13. The next day, he failed to appear in court on his drug case, and he again failed to appear on August 7, 2007. Exhibit 7, page 2, and Exhibit 8A.

Oliver finally appears to have been captured on August 7, 2007. He was found incompetent to stand trial in the failure to register as a sex offender case; the court ordered him confined to a treatment facility. Exhibit 8A, page 2; Exhibit 15.

While in the treatment facility, Oliver was charged with failure to comply with an order or signal of a police officer. Exhibit 16. Two weeks later, on November 14, 2007, the court

14

found him competent to stand trial. Exhibit 17. It sentenced him to two years in prison after finding that he was "not amenable to community control." Exhibit 18.

On his return to jail from court, Oliver attempted suicide by taking an overdose of pills and he was hospitalized for two days. Exhibit 34 and Proposed Exhibit 47. None of this information was presented at Mr. Shaykin's preliminary examination, trial, or direct appeal.

On July 28, 2009, Oliver was transported from an Ohio prison to Lenawee County District Court in Adrian, MI, to testify at the preliminary examination in this case. Afterwards he was returned to prison in Ohio. Exhibit 4.

On September 15, 2009, Oliver was taken from the Ohio prison to the Allen County Ohio Courthouse where he was given a subpoena in this case along with a witness fee check for $52.00. Oliver was returned to prison and released the next day with instructions to appear before the Lenawee County Circuit Court for Mr. Shaykin's trial on October 27, 2009. Exhibits 5 and 6. He did not appear and the trial court allowed the prosecution to read his preliminary examination testimony to the jury.

Mr. Shaykin's counsel did not present evidence of Oliver's exploits listed above. Every prisoner released on bond or parole must promise to appear as required, yet Oliver clearly never did. This evidence is admissible to show that Oliver has the habit of saying what ever he thinks he has to say to get out of trouble or jail. M.R.E. 405(b), 406, 404(b). Counsel did not discover or present the following impeaching evidence.

15

Oliver pled not guilty by reason of insanity two weeks before the events at issue in this case. After a psychiatric exam, the Ohio court found him incompetent to stand trial. Exhibits 14 and 15. At Mr. Shaykin's preliminary examination on July 29, 2009, Oliver denied having been found incompetent to stand trial. Exhibit 32, page 4. These lines were excised from the testimony that Mr. Shaykin's jury heard, and counsel did not try to impeach Oliver's false testimony. "It is just as reasonable that a jury be informed of a witness's mental incapacity at a time about which he proposes to testify as it would be for the jury to know that he then suffered an impairment of sight or hearing. It all goes to the ability to comprehend, know, and correctly relate the truth." United States v. Partin, 493 F.2d 750, 763 (5th Cir. 1974).

Oliver's criminal record includes convictions for rape and kidnapping, for which he was on parole at the time of the events in this case. Exhibits 19, 19A, 19B, and 20. Mr. Shaykin's counsel did not bring this up and he allowed the prosecutor to argue to the jury, "[Mr. Shaykin] hadn't counted on the fact that [Oliver and Snodderly] said 'I may be a thief but I'm not a kidnapper,'" (T 210-211), which of course, Oliver was. This information may well have led the jury to conclude that Oliver made up the story based on his own experiences to get himself out of the trouble he was in for failing to appear in court, absconding from his parole placement, failing to register as a sex offender, and drug possession. But the jury never heard any of this.

16

Oliver received benefits from his testimony that were not disclosed to the jury, including being released from custody after his June 17, 2007 arrest, Exhibit 22 page 6, although he was at the time an absconder from parole on kidnap and rape charges and an absconder from bond in at least two other cases. Instead of the truth, the jury heard Oliver testify that he got nothing out of it (T 183), and the jury heard the prosecutor argue for three pages that Oliver got no reward: "Nobody is profiting out of this," Oliver had "no motivation," "I'm not getting nothing out of this" (T 234-236).

Oliver testified, "I have no idea what a grand jury is" (PE 158, T 184). A post-trial search of Ohio court records revealed that Oliver had been indicted by at least three grand juries in Lucas County, Ohio, and he was subpoenaed to testify against Mr. Shaykin at the grand jury in Lucas County. Exhibits 7, 10, 13, and 19A.

Oliver and Snodderly testified that Mr. Shaykin showed them maps and satellite images on his computer (PE 116-117, T 142-143). The State's expert, Detective Emrick (now chief of the Adrian, MI, Police Department), examined Mr. Shaykin's computer and Detective Langford told the trial court, "There was no map. We couldn't find any aerial photographs that the witnesses say that they saw on the computer. We did not discover those" (10/21/09, Pretrial Motion Hearing, T 14). The jury was not told about this. Had they known, there is no way they would have been able to convict Mr. Shaykin of using a computer to solicit the crime of false imprisonment. See habeas brief, Issue

17

IV.

Oliver testified that Mr. Shaykin told him he found Ashley Clark with missing persons posters (PE 113, T 139). Oliver told police that Mr. Shaykin said he found her with a reverse phone number look-up. Exhibit 22, page 2.

Oliver testified that he smoked marijuana "pretty much" every day (PE 147, T 171). He told police he did not use it. Exhibit 22, page 3.

Oliver testified that Snodderly and Leo Sanscrant went to a warehouse while he talked with Mr. Shaykin (PE 110-111, T 136-137). He told police that Mr. Shaykin broke into the warehouse and stole speakers. Exhibit 22, page 10.

Oliver testified that he and Shaykin waited in the car until the others returned to the car from the warehouse (T 137). Snodderly told police that Mr. Shaykin dropped him and Leo Sanscrant off at the warehouse and they walked back to the apartment. Exhibit 21, page 5.

Oliver testified that Mr. Shaykin gave him a map that showed the location of 883 Colburn (the site of the alleged abduction) "so that we didn't get lost" (PE 126, T 153). Exhibit 21 shows why this is not credible: Oliver's partner Josh Snodderly lived 4-1/2 blocks away at 1307 Colburn.

Oliver was not candid about his address. Oliver testified that he lived on Western Avenue in Toledo (PE 103-104, T 128-129). Oliver was paroled and released on bond to 3740 Cavalear, Toledo. Exhibit 8. He was registered as a sex offender at the Cavalear address. Exhibit 20. And he gave the Cavalear address

to police on June 17, 2007. Exhibit 21, page 1.

New evidence shows that Josh Snodderly was not credible.

Snodderly too was not candid about his address. He testified that he lived on Western Avenue in Toledo at the time of these events (PE 96, T 89), but he told police he lived at 1307 Colburn. Exhibit 21, page 1.

Like Oliver, Snodderly testified that Mr. Shaykin showed him maps on his computer (PE 65, T 93, 104-105). But the State's expert, Detective Emrick, examined Mr. Shaykin's computer and Detective Langford reported, "There was no map. We couldn't find any aerial photographs that the witnesses said that they saw on the computer. We did not discover those." (10/21/09 Pretrial Motion Hearing, T 14). The jury never heard this.

Snodderly testified that Mr. Shaykin told him to throw Ashley Clark in the trunk of Mr. Shaykin's car and that there was no speaker box in the trunk (T 93, 124). Police photos of Mr. Shaykin's car show there was no room for her in the trunk because of a large speaker box that is built into the trunk Exhibit 23, page 2, and Exhibit 41. The jury never saw this.

Snodderly testified that he was not aware that they were going to break into a warehouse until they got to Michigan (PE 76, T 102). But he told police that the reason they came to Michigan was to break into the warehouse. Exhibit 22, page 5.

Snodderly testified that he did not know Mr. Shaykin's son (PE 71). He told police that he did know him. Exhibit 22, page 12. The jury never heard these discrepancies.

Snodderly told the jury "In my juvenile years I'm pretty

19

sure I got a false identification for giving a police officer a wrong name" (T 118). He testified outside of the jury's presence that he had no adult convictions except for traffic tickets, a juvenile burglary conviction, and a juvenile arrest for obstructing official business (T 118-121). The jury was not told about those.

When questioned by police on June 17, 2007, Snodderly was unsure whether he had outstanding warrants. Exhibit 22, page 7. The Lucas County Sheriff's Office Booking Summary on Snodderly, Exhibit 33, page 4, shows his <u>adult</u> arrest for obstructing official business, Case No. CRB-07-15814-0202, and the Toledo Municipal Court Clerk's Certified Journal Report, Proposed Exhibit 48, shows his <u>adult</u> conviction on March 27, 2009. Exhibit 33 also reflects a conviction for driving without a license, Case No. TRD-07-24888-0101, and the Toledo Municipal Court Clerk's Certified Journal Report, Proposed Exhibit 48, shows that a bench warrant was issued on April 7, 2008 when he failed to appear, and he remained at large until March 24, 2010. In the meantime, he testified at the preliminary examination and trial of this case. The jury was not told about his outstanding bench warrant.

<u>New evidence shows that Ashley Clark is not credible.</u>

Ashley Clark testified at trial that she knew nothing about the alleged plot to kidnap her except what the police told her (T 51). But she told the Adrian, MI, police that Mr. Shaykin actually had someone assault her and hold her against her will in Toledo, Exhibit 25, something that is undisputedly not true.

20

Clark testified that Mr. Shaykin was to give her $20 (T 54). She told police that he was to give her $400. Exhibit 24. The tapes of her phone calls to Mr. Shaykin show that she demanded $400 and other amounts of money from him. Proposed Exhibit 42.

New evidence shows that Detective Langford was not credible.

Detective Langford testified that a missing persons poster seeking Ashley Clark was found in Mr. Shaykin's car (T 56). That was not true and no such poster is not listed in the police inventory of his car when it was seized at the time of his arrest. Exhibit 26.

Detective Langford testified that police found a map to Clark's house in Mr. Shaykin's car (T 57). That is not true and no map is listed on the inventory of Mr. Shaykin's car. Exhibit 26.

Detective Langford testified that a large knife, People's Exhibit 9 at trial, was found on either Mr. Shaykin, Oliver, or Snodderly (T 59). That was not true. Police reports document that the knife was not on any of them; it was given to police later at 1502 Western Avenue, Toledo. Exhibits 27, 28, 29.

The Lucas County, Ohio, prosecutor sent the knife to the lab to check for fingerprints. Exhibit 30. The results of the testing were never produced or provided. Where the party in possession of relevant evidence does not produce it, the law allows a fact-finder to presume that the evidence would be adverse to that party. Mr. Shaykin's fingerprints were not on the knife.

21

<u>New evidence shows that Detective Smith is not credible</u>.

Detective Smith testified that "one of the boys" had the knife (People's Exhibit 9) at the "crime scene" on Colburn Street (T 71-72). As noted, police reports show that it was seized at 1502 Western afterwards. Exhibits 27, 28, 29.

Detective Smith testified that a bandanna was found in the trunk of Mr. Shaykin's car (T 64). This was not true; it is not on the inventory. Exhibit 26.

Detective Smith testified that officers took an orange cell phone from Mr. Shaykin (T 64). There was no orange cell phone involved at all. Police photos show a blue cell phone and a silver one. Exhibit 23, page 1, Proposed Exhibit 41. The police report lists a single Nokia cell phone; this was the blue one they seized from Mr. Shaykin. Exhibits 28 and 29.

Conclusion

Detective Emrick, now Adrian, MI, police chief, said there was no evidence of the maps and aerial photographs Oliver and Snodderly claimed to have seen on Mr. Shaykin's computer. Oliver and Snodderly testified that Mr. Shaykin shows them videos on his TV, not on the computer (T 106, 144, 155). This evidence plus the evidence at trial shows that Mr. Shaykin is not guilty of using a computer to commit any crime.

Documentary evidence from the courts and the police records show that the state's lay and police witnesses are not credible. Oliver and Snodderly lied at every opportunity, but the jury never heard this evidence. Likewise, Ashley Clark and Detective Langford and Smith said what ever they thought they had to say

22

to convict Mr. Shaykin. If the jury heard the impeaching evidence presented here that was not presented at trial "it surely cannot be said that a juror, conscientiously following the judge's instructions requiring proof beyond a reasonable doubt, would vote to convict." Schlup, 115 S.Ct., 869.

Had the jury heard the evidence impeaching the credibility of Detectives Langford and Smith, it "would have shown that even the police testimony in the case may not be believed, making the jury's task of discerning [Mr. Shaykin's] guilt beyond a reasonable doubt even less obtainable." Cargle v. Mullin, 317 F.3d 1196, 1216 (10th Cir. 2003).

The Court should grant equitable tolling because Mr. Shaykin is actually innocent of any crime.

IV.  The statute of limitations did not begin to run for Mr. Shaykin's habeas petition until he obtained the Exhibits that support his claims, which were not available at the time of his trial.

28 U.S.C. 2244(d)(1) provides that the 1 year statute of limitations on federal habeas corpus "shall run from the latest of ... (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed if the applicant was prevented from filing by such State action ... or (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."

Here, neither Mr. Shaykin's trial lawyer nor his appellate lawyer did the investigation the Sixth Amendment requires. See

23

arguments I, II, III, IV, V, VI, and VIII in the brief in support of his habeas petition. The trial court would not allow an investigator and denied Mr. Shaykin's discovery motion. See argument VII in the brief in support of his habeas petition. As a result, Mr. Shaykin had to do his own investigation, with virtually no resources, from prison. It led to the discovery of the evidence included in the Exhibits submitted with his habeas petition. The only Exhibits that were part of the trial court record are 1, 2, 3, and 32.

The record made at trial is seldom adequate to prove ineffective assistance of counsel because, as the Supreme Court pointed out in Massaro v. United States, 538 U.S. 500; 123 S.Ct. 1690, 1694; 155 L.Ed.2d 714 (2003), the evidence introduced at trial "in many cases will not disclose the facts necessary to decide either prong of the Strickland analysis." The Court in Massaro held that applying a procedural default rule that required defendants to raise ineffective assistance of counsel claims on direct appeal would cause defendants to raise the claims "before there has been an opportunity fully to develop the factual predicate for the claim." Mr. Shaykin could not file a meaningful post-conviction or habeas petition until he assembled the evidence "fully to develop the factual predicate" for his claims.

Issues I and II in Mr. Shaykin's habeas petition are supported by Exhibits 1 through 13, 15, 18, 19, 19A, and 19B.

Issue III is supported by Exhibits 5 through 11, 13 through 30, and 32 through 41.

24

All of the Exhibits support issues IV through VIII.

It took until February 2013 to obtain these records. See for example Exhibit 8A, January 18, 2013; Exhibit 33 and 34, January 29, 2013; and Exhibit 11, February 13, 2013. That the state courts were totally unresponsive to Mr. Shaykin's attempt to gather proof of his innocence can be seen from their denial of his motion to expand the record under M.C.R. 6.507.

While the Respondent may argue that Mr. Shaykin knew about either some of the claims or some of this evidence, one federal court pointed out that the issue is proof, not knowledge. United States v. Silver, F.Supp. , (D. Mass. ). That is consistent with Massaro's holding that a defendant should have the "opportunity fully to develop" the factual predicate for his ineffective assistance of counsel claims.

The Court should find that the statute of limitations did not begin to run for Mr. Shaykin's habeas petition until February 13, 2013.

Relief

Mr. Shaykin respectfully requests that the Court will deny Respondent's motion to dismiss.

Respectfully submitted

May 18, 2015

Mark Ronald Shaykin

25

AFFIDAVIT OF MARK R. SHAYKIN

I make this affidavit in opposition to the Respondent's motion for summary judgment and if sworn as a witness I am competent to testify to the following facts:

1. The trial court denied my motion for an investigator and discovery.

2. During and after my direct appeal, I did my best to investigate and collect evidence which my lawyers did not get that supports my claims of innocence and shows that the people who accused me were not telling the truth. It was slow tedious work to do this because I was seeking records from courts and law enforcement agencies in Michigan and Ohio. Some responded, some did not, and Michigan agencies would not provide anything because Michigan's Freedom of Information Act excludes prisoners. M.C.L. 15.231(2).

3. The new evidence is included in the Exhibits supporting my habeas petition. As noted on page 1 of the Brief in Support of my petition, all Exhibits in support of my habeas petition except 1, 2, 3, and 32, were not part of the record during my trial and direct appeal.

4. When I had obtained what I believed to be sufficient evidence to support my claims, I filed a motion for relief from judgment under M.C.R. 6.500, along with a motion to expand the record pursuant to M.C.R. 6.507. In my motion to expand the record, I explained the new evidence I had uncovered and asked the court to add it to the record, and I asked the court to order the production of other evidence which agencies and courts

Petitioner's Exhibit 1, page 1

had been unwilling to provide.

5.    I mailed my motions for relief from judgment and to expand the record to the trial court and county prosecutor using the Michigan Department of Corrections' Expedited Legal Mail service. The Disbursement Authorization Forms show the date and time I gave the mail to prison staff, and they show the date and time the prison staff placed it in the outgoing mail. Exhibits 2 and 3.

6.    Exhibits 2 and 3 show that I gave the trial court's and prosecutor's copies to staff on April 19, 2013. They show that the prosecutor's copy was placed in the outgoing mail on April 20, 2013, Exhibit 3, and the court's copy was not placed in the outgoing mail until April 21, 2013.  Exhibit 2.

7.    Exhibit 4 is page 1 of my prison account statement for the month of April 2013, which shows that on April 26, 2013 I was charged $6.16 for legal mail that went out on 3/21/13 (court's original and one copy) and I was charged $5.32 for legal mail that went out on 3/20/13 (prosecutor's copy).

I swear and declare on penalty of perjury that these statements are true.

May 18, 2015

Mark R. Shaykin

Mark Ronald Shaykin

Petitioner's Exhibit 1, page 2

**MICHIGAN DEPARTMENT OF CORRECTIONS**
**DISBURSEMENT AUTHORIZATION (EXPEDITED LEGAL MAIL - PRISONER)**

4835-3318
CSJ-318  05/02

Please PRINT clearly illegible and/or incomplete forms will not be processed.

_6-96_
Lock

_I.C.F._
Institution

_314630_
Prisoner Number

_M. Shaykin_
Prisoner Name (Print Clearly)

[X] Legal Postage　　[ ] Filing Fee $_____　　[ ] Certified Mail (Must Be a Court Ordered Requirement)

[ ] New Case　　[X] Case Number　09-14329-FC

Pay To: _Postage_

Mailing Address: _Clerk of the Court_
_Lenawee County Circuit Court_
_Rex B. Martin Judicial Building_
_425 North Main Street_
_Adrian, MI 49221_

**The following section must be completed in Authorizing Staff Member's presence.**

Prisoner Signature: _____　Date & Time Submitted: _____

Received By
(Print Name & Title) _____　Staff Signature: _____

Date & Time Received by Authorizing Staff _____

**Authorization Denied:**

[ ] Does not meet definition of legal mail or court filing fee as identified in CFA OP 05.03.118.

[ ] Not hand delivered to authorizing staff member.　　[ ] New case or case number not on form.

[ ] Does not include court order for handling as certified mail.　　[ ] Other _____

[ ] Prisoner refused to sign & date in staff member's presence.　　_____

**Section below to be completed by Mail Room Staff.**

Placed in Mail by
(Print Name & Title) _____　Signature: _____

Postage Amount $ _____　Date & Time placed in outgoing Mail _____

**Only Business Office Staff are to Write in the Section Below**

| Obligation Amount | | Actual Expense | | [ ] Court filing Fee Denied due to NSF. |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

Date Posted: _____

Date & Time Copy Sent to Prisoner: _____

Processed By
(Print Name & Title): _____　Signature: _____

DISTRIBUTION:　White - Prisoner Accounting　Canary - Prisoner　Pink - Counselor's File　Goldenrod - Prisoner

Petitioner's Exhibit 2

**MICHIGAN DEPARTMENT OF CORRECTIONS**
**DISBURSEMENT AUTHORIZATION (EXPEDITED LEGAL MAIL - PRISONER)**

4835-3318
CSJ-318 05/02

**Please PRINT clearly illegible and/or incomplete forms will not be processed.**

6-96    I.C.F.
Lock        Institution

314630        M. Shaykin
Prisoner Number        Prisoner Name (Print Clearly)

☒ Legal Postage        ☐ Filling Fee $_____        ☐ Certified Mail (Must Be a Court Ordered Requirement)

☐ New Case        ☒ Case Number    09-14329-FC

Pay To:    Postage

Mailing Address:    Lenawee County Prosecuting Attorney

425 North Main Street

Adrian, MI 49221

**The following section must be completed in Authorizing Staff Member's presence.**

Prisoner Signature _____    Date & Time Submitted 3/13/13  13.00

Received By _____    Staff Signature _____
(Print Name & Title)

Date & Time Received by Authorizing Staff _____

**Authorization Denied:**

☐ Does not meet definition of legal mail or court filing fee as identified in CFA OP 05.03.118.

☐ Not hand delivered to authorizing staff member.        ☐ New case or case number not on form.

☐ Does not include court order for handling as certified mail.        ☐ Other _____

☐ Prisoner refused to sign & date in staff member's presence.    _____

**Section below to be completed by Mail Room Staff**

Placed in Mail by _____    Signature _____
(Print Name & Title)

Postage Amount $ _____    Date & Time placed in outgoing Mail 3/13/13  13.00

**Only Business Office Staff are to Write in the Section Below**

| Obligation Amount | | Actual Expense | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

☐ Court filing Fee Denied due to NSF.

Date Posted: _____

Date & Time Copy Sent to Prisoner: _____

Processed By
(Print Name & Title): _____    Signature: _____

**DISTRIBUTION:**    White - Prisoner Accounting    Canary - Prisoner    Pink - Counselor's File    Goldenrod - Prisoner

Petitioner's Exhibit 3

Date: 04/17/2013 12:58:31

**Michigan Department Of Corrections**

**Trust Account Statement**

**For the period 03/20/2013 to 04/17/2013**

Page 1 of 2

| | | |
|---|---|---|
| MDOC Nbr.: 314630 | Name: Shaykin, Mark Ronald | Current Lock Loc.: 6-096 |
| Birth Date: 01/28/1964 | Location: IONIA CORRECTIONAL FACIL | Jurisdiction Dates: 10/28/2009 | Active: Yes |
| Current Balance: 24.13 | Hold Balance: .00 | Account Dates: 11/19/2010 | A/C. Status: Active |

## Sub Account Details

| Account Code | Account Name | Balance As of 03/20/2013 | Balance As of 04/17/2013 |
|---|---|---|---|
| **Trust-Ionia Maximum Caseload** | | | |
| 2101 | Offender Funds | 0.00 | 24.13 |
| 2198 | Freeze | 0.00 | 0.00 |
| **Trust-Kinross/Chippewa Caseload** | | | |
| 2101 | Offender Funds | 0.00 | 0.00 |
| 2198 | Freeze | 0.00 | 0.00 |
| **Trust-SMR Jackson Caseload** | | | |
| 2101 | Offender Funds | 0.00 | 0.00 |
| 2198 | Freeze | 0.00 | 0.00 |
| **Trust-Bellamy Creek Facility Caseload** | | | |
| 2101 | Offender Funds | 0.00 | 0.00 |
| 2198 | Freeze | 0.00 | 0.00 |

## Debts & Obligations

| Deduction Type | | Information No. | Effective Date | Original Amount | Amount Paid | Amount Owed |
|---|---|---|---|---|---|---|
| **Trust-Ionia Maximum Caseload** | | | | | | |
| OLCPB | Legal Copies (PBF) | 53205838 | 04/04/2013 | 14.10 | 9.01 | 5.09 |
| OLPPB | Legal Postage (PBF) | 53288370 | 04/10/2013 | 0.46 | 0.00 | 0.46 |

## Transaction Details

| GJ No. | Date | Description | Debit | Credit |
|---|---|---|---|---|
| **Trust-Ionia Maximum Caseload** | | | | |
| 53018881 | 03/20/2013 | LPOSPBF Legal Postage Disbursement (PBF) | .45 | |
| | | 2101 Offender Funds | 0.00 | |
| | | 2582 Postage (PBF) Payable - Direct | | 0.00 |
| | Narration: | Batch: 1638251, Ref:03-19-13 - | | |
| 53018882 | 03/20/2013 | LPOSPBF Legal Postage Disbursement (PBF) | .45 | |
| | | 2101 Offender Funds | 0.00 | |
| | | 2582 Postage (PBF) Payable - Direct | | 0.00 |
| | Narration: | Batch: 1638251, Ref:03-19-13 - | | |
| 53018961 | 03/20/2013 | PCD Phone Credit Disbursement | .00 | |
| | | 2101 Offender Funds | 0.00 | |
| | | 2596 Phone Credit Payable | | 0.00 |
| | Narration: | Batch: 1638256, Ref:NSF 10.00 - | | |
| 53079614 | 03/26/2013 | LPOSPBF Legal Postage Disbursement (PBF) | 6.16 | |
| | | 2101 Offender Funds | 0.00 | |
| | | 2582 Postage (PBF) Payable - Direct | | 0.00 |
| | Narration: | Batch: 1640902, Ref:03-21-13 - | | |
| 53079628 | 03/26/2013 | LPOSPBF Legal Postage Disbursement (PBF) | 5.32 | |
| | | 2101 Offender Funds | 0.00 | |
| | | 2582 Postage (PBF) Payable - Direct | | 0.00 |
| | Narration: | Batch: 1640902, Ref:03-20-13 - | | |
| 53136401 | 04/01/2013 | LPOSPBF Legal Postage Disbursement (PBF) | .46 | |
| | | 2101 Offender Funds | 0.00 | |
| | | 2582 Postage (PBF) Payable - Direct | | 0.00 |
| | Narration: | Batch: 1642948, Ref:03-29-13 - | | |
| 53136402 | 04/01/2013 | LPOSPBF Legal Postage Disbursement (PBF) | .46 | |

Petitioner's Exhibit 4

Mark R. Shaykin 314630
Macomb Correctional Facility
34625 26 Mile Road
New Haven, MI 48048

May *18*, 2015


Clerk of the Court
United States District Court
231 West Lafayette Blvd.
Detroit, MI 48226

Re: Shaykin v. Romanowski, No. 14-cv-13399-LJM-DRG

Dear Clerk:

Enclosed please find for filing in this matter the original
and Judge's copy of my Petitioner's Reply to Respondent's Motion
for Summary Judgment with supporting exhibits and proof of
service. Thank you very much.

Very truly yours,

Mark R. Shaykin

Encls.

cc: Timothy C. Erickson



### PROOF OF SERVICE

I swear and declare on penalty of perjury that on May *18*,
2015 I served a copy of Petitioner's Reply to Respondent's Motion
for Summary Judgment with supporting exhibits on Timothy C.
Erickson, Assistant Attorney General, at P O Box 30217, Lansing,
MI 48909, by first class mail via the Michigan Department of
Corrections Expedited Legal Mail service.

Mark R. Shaykin



KIN #314630
rectional Facility
ile Road
T 48048

UNITED STATES POSTAGE
PITNEY BOWES
02 1M
0004273525     MAY 18 2015
MAILED FROM ZIP CODE 48048
$ 03.94

ClerK oF THE CouRT
UNited States District Court
231 West Lafayette Blvd.
DeTroit, MICHIGAN
          48226