UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK R. SHAYKIN,

     Petitioner,

v.

KENNETH ROMANOWSKI,

     Respondent.

Case No. 14-cv-13399
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS [1], DENYING THE MOTION TO PRODUCE RULE 5 MATERIALS [22], GRANTING IN PART THE MOTION TO EXPAND THE RECORD [23], DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS***

---

Petitioner Mark R. Shaykin, a Michigan prisoner, filed a *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Petitioner is serving a sentence for convictions related to the attempted kidnapping of his niece. He argues that his confrontation and due process rights were violated during trial, and his trial and appellate attorneys rendered ineffective assistance. Having reviewed the Petition, the warden's response, and the state-court record, the Court concludes that the state courts' determination that these claims were without merit was not unreasonable. Therefore, the Petition will be denied.

## I.  FACTUAL BACKGROUND

Petitioner was convicted following a jury trial in Lenawee County Circuit Court. The jury heard the following evidence.

The intended victim, Ashley Clark, is Shaykin's niece by marriage. She testified that in June 2007, she was living in the same house with him in Michigan. (R. 9-8, PID 597.) After the two had a falling out, she moved to Toledo, Ohio to live with another relative, Nina Rosalis. (*Id.*

at PID 598, 601.) At that point, Clark wanted nothing to do with Shaykin, but had seen him around Toledo twice since moving there. (*Id.* at PID 599.) Still, she never had any indication that there might be "any attempt to grab [her] or kill [her] or harm [her.]" (*Id.* at PID 598.) In the meantime, the two had a few conversations regarding money Shaykin had promised Clark, and Shaykin's concern that Clark may be using drugs. (*Id.* at PID 601.)

Long-time friends Joshua Snodderly and Allen Oliver were living in Toledo, Ohio at the time of the offense. At trial, Snodderly testified that Oliver had approached him at a skate park, stating that a man "ha[d] a bit of a job for us to do." (R. 9-8, PID 637.) He identified that man as Shaykin at trial. (*Id.*) Shaykin had offered a "surplus" of sleeping pills, marijuana, and potentially some money to them as payment for the job, which had yet to be fully explained to them. (R. 9-8, PID 645.) Snodderly, Oliver, and their friend Leo Sacrant drove with Shaykin to his apartment in Adrian, Michigan. (R. 9-8, PID 638.) On the way, Shaykin discussed his niece, but "didn't let the whole plot unfurl until we got to his apartment." (*Id.*) The group thought that Shaykin was "looney, out of control," but they figured they might "see what we [could] get" of value out of his apartment. (R. 9-8, PID 639.)

Inside the apartment, Shaykin presented several images on his computer. He showed the group maps of Clark's house and her neighborhood, as well as images of Clark that Snodderly described as "pornographic." (R. 9-8, PID 640.) Shaykin explained to the group that he "wanted us to kidnap her, go in and drag her out the back door and throw her in his trunk and let him have his way with her." (*Id.*) At that point, the group realized that Shaykin "was serious" and "started thinking we wanted out of it but he was our only ride home." (R. 9-8, PID 641.) Shaykin then presented the group with a knife he wanted them to use in the crime, stating, "This represents me. She will know who is coming after her." (R. 9-8, PID 642.) Later, Shaykin showed them

2

several items in his car trunk, including "rope, bandanas, gloves, rolling pin with duct tape on it." (R. 9-8 PID 642–43.) Snodderly recognized several items that had been admitted as exhibits as items that were in Shaykin's trunk. (*Id.*) Later that evening, Shaykin drove the group back to Toledo, where he fell asleep on Snodderly's couch. (R. 9-8, PID 646.)

The next morning, Shaykin drove the group to the house where Clark was staying. Shaykin instructed the group, "Go in there and get her. Tie her up and drag her out the back." (R. 9-8, PID 646.) At that point, Snodderly had the impression that Shaykin was going to do something to harm Clark and decided that he wanted no part of it. (*Id.*) So instead of dragging Clark out of the home, the group knocked on the door and told the woman who answered what was happening. (*Id.* at PID 647.) Shaykin was under the impression that the group was just staking out the property. (*Id.*) That afternoon, the group returned to the house. At that point, the "lady at the house had contacted police and . . . got everything set up." (*Id.* at PID 669.) Police arrested Shaykin in his car, which was parked around the corner from the house. (*Id.* at PID 671.)

Greg Smith, a retired police sergeant with the Toledo police department, was the first officer to come to the house. Smith got the call around 4:30pm on the day Shaykin was arrested. The callers stated that they had agreed to kidnap a girl for someone else, but they did not want to do it and they were scared. (*Id.* at PID 617.) Smith went to the scene, where he found Oliver, Snodderly, and Sancrant. (*Id.* at PID 619.) He talked to them for ten to fifteen minutes and they told him that Shaykin had given them a knife. (*Id.* at PID 620.) His impression was that "these young men felt that they were being hired to get this young lady away from that house for whatever reason and take her by force if necessary." (*Id.* at PID 624.) Smith recovered from the scene a knife, some cell phones, a hand-drawn map, and a neckerchief-bandana. Smith found surgical gloves, a rolling pin with duct tape on it, a roll of duct tape, show strings, pills, and

3

another bag of latex gloves in the trunk of Shaykin's car. (*Id.* at PID 612.) From the backseat of the car, Smith recovered a ski cap. (*Id.*)

Shaykin was arrested at the scene and Smith, along with Detective Johnson, interviewed him at the station. (*Id.* at PID 631.) Shaykin indicated that his "intent" in the situation was that "he felt that he was being extorted; that Ms. Clark was trying to extort money from him in a beating that he had inflicted upon her on Mother's Day and that if he didn't pay her the money she was going to go to the police, in a general sense." (*Id.* at PID 630.) He did indicate to Smith, however, that he had not wanted force to be involved. (*Id.* at PID 633.)

The prosecution intended to call Allen Oliver as its last witness. He was subpoenaed, but failed to appear. (*Id.* at PID 673.) However, Oliver had previously testified at a preliminary examination, and was subject to cross-examination by Shaykin's trial counsel (*id.* at PID 743), so the prosecutor asked to read that transcript into the record. (*Id.* at PID 673.) Defense counsel did not object, and the trial court granted the request. (*See id.*) During the preliminary hearing, Oliver had testified that he met Shaykin through mutual friends, and Shaykin asked him to help him "take care of" a girl who was extorting money from him. (*Id.* at PID 678.) Oliver thought that Shaykin was serious about the offer, and recruited Snodderly and Sancrant to help. (*Id.* at 680.) But as Shaykin started discussing his plan, Oliver concluded "he can't possibly . . . be serious about this whole thing . . . we were thinking, well, we will just hang out with him, let him give us whatever he's going to give us, and then whatever we get from him, you know, cut him off." (*Id.* at PID 683.) In Shaykin's apartment, Oliver saw missing persons posters with Clark's picture on them—Shaykin explained that he had posted the flyers around Toledo and that was how he found out where Clark was living. (*Id.* at 686.) Oliver's impression was that Shaykin was "completely obsessed" with Clark. (*Id.* at PID 693.)

4

The jury convicted Shaykin of the following offenses: conspiracy to commit unlawful imprisonment, Mich. Comp. Laws §§ 750.157a, 750.349; two counts of solicitation of unlawful imprisonment, Mich. Comp. Laws §§ 750.157b(3); 750.349, and using a computer to commit solicitation of unlawful imprisonment, Mich. Comp. Laws § 752.797(3)(e). The jury found Shaykin not guilty of the following charges: conspiracy to commit murder, two counts of solicitation to commit murder, and using a computer to commit solicitation to commit murder.

The Michigan Court of Appeals affirmed Shaykin's conviction. *People v. Shaykin*, No. 295883, 2011 WL 668255 (Mich. Ct. App. Feb. 22, 2011). The Michigan Supreme Court denied leave to appeal. *People v. Shaykin*, 803 N.W. 2d 326 (Mich. 2011). The Supreme Court denied certiorari. *Shaykin v. Michigan,* 132 S. Ct. 1590 (2012); *reh. den.* 132 S. Ct. 1963 (2012). Shaykin subsequently filed a post-conviction motion for relief from judgment, which was denied. *People v. Shaykin,* No. 09-14329-FC (Lenawee Cty. Cir. Ct. Apr. 24, 2013). The Michigan appellate courts denied him leave to appeal. *People v. Shaykin,* No. 317649 (Mich.Ct.App. Dec. 27, 2013); *lv. den.* 849 N.W. 2d 372 (Mich. 2014).

Shaykin signed his habeas petition on August 26, 2014, and it was filed with this Court on September 3, 2014. (R. 1.) Respondent filed a motion for summary judgment on the ground that petitioner's application for writ of habeas corpus was barred by the statute of limitations found in 28 U.S.C. § 2244(d)(1). The Court denied the motion and ordered an answer addressing the merits of the petition. *Shaykin v. Romanowski,* No. 14-CV-13399, 2016 WL 193381 (E.D. Mich. Jan. 15, 2016). The answer has been filed, and Shaykin has filed two additional motions. The matter is now ready for review.

## II.  MOTION TO EXPAND RECORD

Shaykin asks the Court to expand the record to include several documents he says show that Oliver and Snodderly were not credible witnesses. (R. 23.) These documents all appear to be attached to Shaykin's filings and include state-court documents regarding those witness' criminal histories. (R. 23, PID 1531.) "Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011). Rule 7(a) of the Rules Governing Habeas Cases, 28 U.S.C. § 2254, provides, "If the petition is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the petition." Alternatively, Rule 8 of the Rules Governing Habeas Cases, 28 U.S.C. § 2254, provides, "If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted."

When the state courts have adjudicated a claim on the merits, a federal court's review in habeas corpus proceedings is ordinarily limited to the record presented to the state courts. *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011); *see also Holland v. Jackson*, 542 U.S. 649, 652 (2004) (per curiam). That is to say, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law." *Cullen*, 563 U.S. 181–82. Where a petitioner's claim was not adjudicated on the merits, "Section 2254(e)(2) continues to have force" and a court may, in limited circumstances, "consider new evidence[.]" *Id.*

Even where § 2254(e)(2) applies, "If the prisoner has failed to develop the facts, an evidentiary hearing cannot be granted unless the prisoner's case meets the other conditions of § 2254(e)(2)." *Williams v. Taylor*, 529 U.S. 420, 430 (2000). Thus, if Shaykin "failed to develop the factual basis of a claim in State court proceedings," the Court cannot grant his motion unless the claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or "a factual predicate that could not have been previously discovered through the exercise of due diligence," and "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2). Although the statute refers explicitly to "evidentiary hearings," several circuit courts have held that the section applies to motions to expand the record under Rule 7 as well. *Ward v. Hall*, 592 F.3d 1144, 1162 (11th Cir. 2010); *Cooper-Smith v. Pal*mateer, 397 F.3d 1236, 1241 (9th Cir. 2005); *Owens v. Frank*, 394 F.3d 490, 498-99 (7th Cir. 2005); *see Holland v. Jackson*, 542 U.S. 649, 653 (2004) (noting that 2254(e)(2)'s restrictions apply "when a prisoner seeks relief based on new evidence without an evidentiary hearing").

The Court will grant in part and deny in part Shaykin's motion to expand the record. Respondent has not opposed Petitioner's motion. Further, it appears that Petitioner did raise factual issues regarding counsel's purportedly deficient cross-examination with the state courts in connection with his motion for relief from judgment. (R. 9-11.) However, as will be discussed later, it does not appear that any state court ever ruled on the merits of the issues presented in that motion. Therefore, deference under 2254(d) will not apply to those claims. Because the materials Shaykin seeks to introduce are cited in support of those claims and may help resolve any factual

disputes in the case, and Shaykin raised these issues with the state courts, the Court will GRANT IN PART and DENY IN PART the motion. The record will be expanded to include the materials Shaykin has submitted, but they will only be considered as to the Court's *de novo* review of Shaykin's ineffective assistance of counsel claims.

### III. MOTION FOR ADDITIONAL RULE 5 MATERIALS

Shaykin also filed a motion asking the Court to compel production of additional Rule 5 materials. (R. 22.) He says Respondent failed to include several state-court filings in the materials that were placed in the record. (*Id.*) The habeas corpus rules require respondents to attach the relevant portions of the transcripts of the state court proceedings, if available, and the court may also order, on its own motion, or upon the petitioner's request, that further portions of the transcripts be furnished. *Griffin v. Rogers*, 308 F. 3d 647, 653 (6th Cir. 2002); Rules Governing § 2254 Cases, Rule 5, 28 U.S.C. § 2254.

It is unnecessary to grant this relief, however, because the materials sought are already part of the record. First, Shaykin's brief in support of his motion for relief from judgment was filed as docket entry 18-1. Second, Shaykin already attached to his motion to expand the record the exhibits he uses in support of his claim that trial counsel was ineffective for failing to impeach Oliver and Snodderly. The Court has granted that motion.

Accordingly, the motion for additional Rule 5 materials (R. 22) is DENIED.

### IV. ANALYSIS OF PETITION

The standard of review this Court applies to each of Petitioner's claims depends on whether the claim was "adjudicated on the merits in state court[.]" 28 U.S.C. § 2554(d); *see also Johnson v. Williams*, — U.S. —, 133 S. Ct. 1088, 1097, 185 L.Ed. 2d 105 (2013).

If a state court already decided the claim "on the merits," the Antiterrorism and Effective Death Penalty Act of 1996 requires this Court to grant the state court's decision deference. In particular, AEDPA prohibits this Court from granting habeas corpus relief for any claim that the state courts "adjudicated on the merits" unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

But "[w]hen a state court does not address a claim on the merits, . . . 'AEDPA deference' does not apply and [this Court] will review the claim *de novo*." *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014).

### A. Confrontation Clause

Shaykin first claims that his constitutional right to confront witnesses against him was violated when "the prosecution did not use due diligence or make a good faith effort to obtain Allen Oliver's presence at trial." (R. 1, PID 3.) Petitioner did not raise this precise claim in his direct appeal; instead, he claimed that his counsel was ineffective for failing to object to the use of Oliver's preliminary examination testimony (Respondent does not argue that this claim is not exhausted (R. 17, PID 1320)). So the first question before the Court is whether the state court's ineffective-assistance determination also addressed the confrontation clause claim, and if so, whether that determination is entitled to deference. Reviewing the ineffective assistance of counsel claim for plain error, the state appellate court's analysis was as follows:

> We review a trial court's determination whether to admit the preliminary examination testimony for an abuse of discretion. *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). A trial court abuses its discretion when it chooses an

9

outcome that is outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

The prosecution may use preliminary examination testimony 'whenever the witness giving such testimony can not, for any reason, be produced at the trial . . . .' MCL 768.26. MRE 804(b)(1) provides the following [hearsay] exception for an unavailable witness's prior testimony:

> Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

MRE 804(a)(5) provides that a witness is unavailable for purposes of this rule if the witness 'is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means, and in a criminal case, due diligence is shown.' The test for due diligence is whether the prosecutor made 'a diligent good-faith effort in its attempt to locate a witness for trial. The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it.' *Bean*, 457 Mich at 684.

Here, the trial transcript is wholly silent with regard to the reason why Oliver did not appear for trial. There is no mention of his absence at any point leading up to the time he was called as a witness. Because defense counsel did not object to the nonproduction of Oliver or request a due diligence hearing, the reasons for Oliver's nonproduction are not apparent from the transcript record. At the time the prosecution called Oliver to the stand, the following exchange occurred:

> The Prosecutor. Our final witness is Allen Oliver. Mr. Oliver was a subpoenaed witness. He has failed to appear. I have his transcript. And I would propose for the final witness to read his testimony in from that.

> The Court. You may proceed. . . .

Defendant now argues that there was no inquiry regarding what due diligence had been shown by the prosecutor to provide Oliver as a witness at trial and the mere statement that Oliver had been subpoenaed is insufficient because it does not address the prosecutor's knowledge of Oliver's receipt of the subpoena, intention to fail to appear, his location, and what efforts, if any, the police took to obtain his presence. Defendant's assertion is not entirely accurate, however, considering the special circumstances presented in securing the witnesses in this case who were all from Ohio.

Here, the record contains four separate documents each entitled 'Request for Attendance of Out-of-State Witness and Certificate of Lenawee County Circuit Court Judge, State of Michigan, to Request Attendance of Out-of-State Witness.' These were requests prepared by the prosecutor for the trial court's signature and seal of the court to be presented to a judge of the Court of Common Pleas in Ohio 'in a proceeding to compel the attendance' of Clark, Snodderly, Detective Willie Johnson, and finally, Oliver. The trial court signed each 'Certificate of Judge Requesting State for Attendance of Out-of-State Witness to Testify in a Criminal Prosecution' and each request was notarized.

The substance of the request relating to Oliver states as follows, in pertinent part:

> 2. That the said defendant has pled not guilty thereto and the trial therein has been set by the court to commence on Tuesday, October 27, 2009 and end Thursday, October 29, 2009.

> 3. That Allen Oliver, who is currently incarcerated in Oakwood Correctional Facility located at 3200 North West Road, County of Allen, State of Ohio, is a necessary and material witness for the State of Michigan in this prosecution by reason of the following:

> That Defendant Mark Ronald Shaykin is accused of soliciting Allen Oliver to kidnap, detain, and kill Ashley Nicole Clark. He would be necessary for providing testimony concerning the solicitation, the plans for carrying out the murder, and any other probative and material details concerning the crime.

> 4. That the personal presence of said Allen Oliver in this Court for the purpose of giving testimony in this jury trial upon behalf of the State of Michigan will be required for the following days: Tuesday, October 27, 2009, commencing at 9:00 a.m., Wednesday, October 28, 2009, commencing at 10:30 a.m. and Thursday, October 29, 2009, commencing at 9:00 a.m. in the forenoon.

> 5. That if Allen Oliver comes into the State of Michigan in obedience to a summons directing him to attend and testify at this trial, the laws of the State of Michigan and of any other State through which said witness may be required to pass by the ordinary course of travel to attend this jury trial, give him protection from arrest or the service of process, civil or criminal, in connection with matters which arose before entrance into this state pursuant to summons.

> 6. That this certificate is made for the purpose of being presented to a Judge of a Court of record of the County of Allen, State of Ohio, where Allen Oliver now is, upon proceedings to compel Allen Oliver to attend

and testify at the trial in said criminal prosecution before this court in the State of Michigan upon the days and dates hereinbefore set forth.

WITNESS, the Honorable Timothy P. Pickard, Judge of said Court, at Adrian, Michigan, this 27 day of August, 2009.

Clearly, the prosecutor had tracked down the whereabouts of Oliver before trial and requested that the trial court call for the Ohio court to compel Oliver to appear at trial on the dates and times set for trial. The trial court signed the prosecutor's request. Defendant admits in his brief on appeal that Oliver was indeed subpoenaed to appear at trial. Thus, the trial court's request must have been mailed to the Ohio court, received, and served on Oliver. . . .The trial court was very aware of the circumstances and, while not stating so on the record, because it allowed the reading of the preliminary examination transcript into the record, it is apparent that the trial court found that diligent, good faith efforts were made to produce Oliver. *People v Dye*, 431 Mich 58, 67; 427 NW2d 501 (1988), *cert den sub nom Michigan v Dye*, 488 US 985; 109 S Ct 541; 102 L Ed 2d 571 (1988) (Whether diligent, good faith efforts were made to produce a witness depends on the particular facts of each case.) On this record, defendant has not shown that the trial court abused its discretion when it admitted Oliver's preliminary examination testimony at trial. *Bean*, 457 Mich at 684.

*People v. Shaykin*, No. 295883, 2011 Mich. App. LEXIS 363, at *10–17 (Ct. App. Feb. 22, 2011).

It is unclear whether AEDPA deference applies to the state court's determination that the trial court did not abuse its discretion by allowing Oliver's preliminary examination testimony. On the one hand, the Third Circuit has held that a state court resolved a federal claim "on the merits" where it "examined the merits in the context of the prejudice prong of an ineffective assistance of post-conviction counsel claim." *Albrecht v. Horn*, 485 F.3d 103, 116 (3d Cir. 2007). Similarly here, the state court examined the merits of the Confrontation Clause claim in the course of addressing Shaykin's "concomitant ineffective assistance of counsel claim," concluding that while the objection would have been "prudent," there was no prejudice because "objecting to the preliminary examination testimony would have ultimately been denied under the circumstances of this case." *Shaykin*, 2011 Mich. App. LEXIS 363, at *17–18.

12

On the other hand, there are conflicting Sixth Circuit opinions regarding whether claims analyzed under the plain-error standard are entitled to AEDPA deference. *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009) held that AEDPA deference would apply. A later case, *Frazier v. Jenkins*, 770 F.3d 485, 496 n.5 (6th Cir. 2014), held the opposite. The Sixth Circuit has acknowledged that "the approaches of *Fleming* and *Frazier* are in direct conflict," *Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015). The Sixth Circuit declined to resolve the conflict because "under either standard of review, AEDPA deference or *de novo*," the claim at issue failed. *Id.* And while this Court is bound by the Sixth Circuit's earlier decision, *see Darrah v. City of Oak Park*, 255 F.3d 301, 310 (6th Cir. 2001), giving Shaykin the benefit of *de novo* review, the Court finds that his claim fails.

Even if the Court were to find that there was a Confrontation clause violation, violations of the Confrontation Clause are subject to harmless-error review. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *see Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) (holding that the *Brecht* standard applies "whether or not the state appellate court recognized the [constitutional] error and reviewed it for harmlessness[.]").In determining whether a Confrontation Clause violation was harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), the Court should consider "(1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross examination otherwise permitted; and (5) the overall strength of the prosecution's case." *Jensen v. Romanowski*, 590 F.3d 373, 379 (6th Cir. 2009) (citing *Van Arsdall*, 475 U.S. at 684).

These factors all favor a finding of harmless error. Oliver was one of Shaykin's three intended accomplices in the crime. Of those three, only Snodderly testified in person at trial—it

13

appears Sacrant was not called as a witness. But Snodderly's testimony was largely the same as Oliver's, though Oliver did provide a better explanation of how Shaykin came into contact with the group, and Oliver did testify that Shaykin told him he wanted Clark killed. But aside from Oliver and Snodderly, the jury heard testimony that Shaykin had problems with Clark, that Shaykin admitted to Smith that he planned to take Clark from her home, and that several items implicating an intended kidnapping were found in Shaykin's car. Although Oliver offered the only testimony suggesting that Shaykin's intent was to kill Clark, Shaykin was acquitted of the attempted murder charges. And the rest of Oliver's testimony was consistent with Snodderly's, Smith's, and Shaykin's own admissions to Smith. Accordingly, the jury had ample evidence aside from Oliver's testimony upon which to base their guilty verdicts. *Ford v. Curtis*, 277 F.3d 806, 810 (6th Cir. 2002). Shaykin is not entitled to habeas relief on this claim.

**B.  Ineffective Assistance of Trial Counsel**

 "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

To succeed on the performance prong, Shaykin must identify acts that were "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The reviewing court must "indulge a strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 689–90.

To satisfy the prejudice prong, Shaykin must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id*.

14

"When a state prisoner asks a federal court to set aside a sentence due to ineffective assistance of counsel," and a state court has already rejected the ineffective-assistance claim "on the merits," Supreme Court precedent "require[s] that the federal court use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013). Thus, where a state court has applied the *Strickland* standard in a merits analysis,

> The key inquiry is not merely whether the state court's application was incorrect. Rather, '[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.' Even where a federal court would reach a contrary conclusion on direct review, it 'must determine what arguments or theories supported or . . . could have supported, the state court's decision,' and reverse only in those extreme cases 'where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents.'

*Brannon v. Rapelje*, No. 16-1124, — F.3d —, 2016 U.S. App. LEXIS 21738, at *8 (6th Cir. Dec. 5, 2016) (citations omitted).

### 1.  Ineffective Assistance of Trial Counsel

Shaykin asserts that his trial counsel was ineffective in nine ways. The Court addresses them in turn and finds that either trial counsel's performance was not deficient, or, if it was, the deficiency did not result in *Strickland* prejudice.

*One.* Shaykin says that trial counsel was ineffective for failing to object to the prosecutor's reading of Oliver's preliminary-examination testimony into the record.

The Michigan Court of Appeals, after conducting the analysis set forth above, concluded that the failure to object was not prejudicial to Shaykin:

> [T]here is no reasonable probability that the result of the proceeding would have been different had counsel objected. We have carefully reviewed the transcript and both Snodderly's testimony and Oliver's testimony recounted the events leading up to defendant's arrest almost identically. The only damaging assertion of Oliver's that Snodderly never mentioned was the fact that defendant told Oliver

15

explicitly that defendant wanted Clark dead. The jury clearly did not credit this testimony, however, because the jury acquitted defendant of all four counts relating to murder . . . . Also, importantly, Oliver was thoroughly cross-examined during the preliminary examination.

In sum, we conclude that defense counsel was not ineffective for failing to object to the admission of Oliver's preliminary examination testimony where Oliver had been ordered by the courts to appear but failed to appear, Snodderly, another co-conspirator testified almost indistinguishably, and defendant had the opportunity to cross-examine Oliver during the proceedings.

*Shaykin*, 2011 Mich. App. LEXIS 363, at *17–19.

This was a reasonable application of *Strickland*. This Court has already found that Shaykin cannot show that he was prejudiced by the admission of Oliver's preliminary examination testimony. Therefore, it was not unreasonable for the Michigan Court of Appeals to conclude that Shaykin could not show that without Oliver's preliminary-examination testimony, there was a reasonably probability that the outcome of the proceeding would have been different.

*Two*. Shaykin next claims that his trial counsel was ineffective for failing to impeach Oliver, Snodderly, Clark, Detective Langford, and Detective Smith. Shaykin raised these claims in a motion for relief from judgment in the Michigan courts. (R. 9-11.)

It appears that these impeachment claims were never adjudicated on the merits. The trial court denied the motion, stating, "Defendant raises issues of ineffective assistance of trial counsel, and the unavailability of a prosecution witness at trial and introduction of that witnesses [*sic*] preliminary exam testimony at trial. All issues were previously raised and decided against Defendant by the Court of Appeals in an eleven page opinion dated February 22, 2011." (R. 9-14, PID 1093.) But the Court of Appeals did not address Shaykin's impeachment-related claims in its opinion—the only ineffective-assistance claim the court addressed was the failure to object to Oliver's preliminary examination testimony. So the Court will review these claims *de novo*.

16

The Court finds that counsel's impeachment and cross-examination of the witnesses was not deficient performance. "Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub,* 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002). "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Id.*

Defense counsel in fact conducted extensive impeachment of the trial witnesses. At the preliminary examination, trial counsel cross-examined Oliver. During that time, he elicited that Oliver had criminal convictions for which he served prison time, smoked marijuana every day, had gotten marijuana from Shaykin, and had been housed in jail rather than state prison for a time due to his cooperation with authorities in Shaykin's case (though he stated this was actually an "inconvenience" since the jail had worse food and no coffee). As to Snodderly, counsel elicited that he too had a criminal record and a history of stealing, and that he and his friends were a "pretty bad group of kids." As to Clark, counsel elicited that she had attempted to extort Shaykin for money and had no personal knowledge of any plan to kidnap her. Detective Smith admitted that he had limited knowledge about the seizure of the items from Shaykin's car, and Detective Langford acknowledged that the Toledo Police, rather than his department, seized those items.

Counsel's closing argument reflected that he deliberately chose to impeach the witnesses in the way he did. *See Krist v. Foltz*, 804 F.2d 944, 948–49 (6th Cir. 1986). Essentially, counsel argued that the entire case came down to the credibility of Oliver and Snodderly—yet, those men were "career thieves" and drug users. (R. 9-9, PID 766.) He suggested that Shaykin had been set up by the group in an attempt to gain leverage to get other charges against them dismissed. He

17

also pointed out to the jury that it was ridiculous for Shaykin to attempt to kidnap Clark on Father's Day in broad daylight when neighbors would have been outside.

Shaykin argues that his counsel should have gone further in his impeachment tactics: he says counsel should have brought up Oliver's insanity plea in a different case, as well as Oliver's convictions for rape and kidnapping, from which he was on parole at the time of the attempted kidnapping of Clark. (R. 1, PID 31.) Shaykin argues that these convictions would have given the jury an even stronger basis to discredit Oliver.

Even on *de novo* review, this Court must affirmatively entertain the range of possible reasons why counsel proceeded the way he did. *Cullen*, 131 S. Ct. at 1407. And here, aside from the potential relevancy issues, counsel could have concluded that because Oliver was already associated with Shaykin in the jury's minds, he did not want the jury to know that Oliver had a rape and kidnapping conviction. The defense was not that Oliver attempted to kidnap and rape Clark and pointed the finger at Shaykin, but rather, that Oliver brought Shaykin to Clark's home to talk but later made up a story that would help him get out of other criminal charges. For the jury to associate Shaykin with a convicted rapist and kidnapper would have run counter to that narrative and the jury could have concluded that if Oliver had raped and kidnapped in the past, Shaykin would also be capable of committing those crimes. And with Oliver admitting to his prior criminal history and drug use in a general sense, the jury was already "well acquainted" with evidence to discount Oliver's credibility. *See Wong v. Belmontes*, 558 U.S. 15, 23 (2009). As to Oliver's insanity plea in Ohio state court, competency to stand trial and competency to serve as a witness are different standards. *Compare* Ohio Revised Code § 2945.38, *with* Mich. R. Evid. 601.

Shaykin also identifies numerous inconsistencies between Oliver and Snodderly's testimony, as well as inconsistencies between each individual's testimony and his prior statements. These include conflicting accounts regarding the warehouse near Shaykin's apartment, the testimony that the plan was to put Clark in the car trunk when the car trunk would not have had room for her, and whether the group made any stops between Toledo and Adrian. (R. 1, PID 34.) But, as stated above, counsel had already extensively impeached both Oliver and Snodderly. It was within his discretion to forego impeachment methods that did not directly benefit his defense as a matter of trial strategy.

The same is true for Clark. Shaykin argues that counsel should have impeached her regarding the issue of her extortion of him and a prior statement where she accused Shaykin of sending someone to assault her and hold her against her will in Toledo. But counsel had already made the point that Clark and Shaykin had a dispute over money and even that she had tried to extort him in the past. And Clark also admitted that she had no prior knowledge of any plot to take her from her home. Going further than that was therefore unnecessary.

*Three*. Shaykin next says that trial counsel was ineffective for failing to present a defense to the computer crime charges. Specifically, Shaykin says that counsel should have called Detective Emmerick, who he says would have testified that he searched Shaykin's computer but did not find any aerial maps or photographs consistent with Oliver and Snodderly's descriptions at trial.

This claim does not show that trial counsel was ineffective. At a pretrial hearing, Detective Langford explained that Shaykin did search Colburn Street, where Clark was living, "numerous times" on that computer. (R. 9-7, PID 534–35.) This testimony could still be consistent with Oliver and Snodderly's if the jury concluded that the searches yielded aerial

19

maps on a web browser. Furthermore, counsel's overall defense strategy was to show that Oliver and Snodderly made up the entire story, and so attempting to disprove a single part could have undermined that strategy by implicitly acknowledging the truth of other parts, including the testimony that Shaykin was "obsessed" with Clark.

*Four.* Shaykin next argues that his trial counsel was ineffective by advising him not to testify and failing to move to exclude his guilty plea in Lucas County, Ohio where he pled guilty to kidnapping, among other crimes, in connection with this case.

When a tactical decision is made by an attorney that a defendant should not testify, the defendant's assent is presumed. *Gonzales v. Elo*, 233 F. 3d 348, 357 (6th Cir. 2000). A federal court sitting in habeas review of a state court conviction should have "a strong presumption that trial counsel adhered to the requirements of professional conduct and left the final decision about whether to testify with the client." *Hodge v. Haeberlin*, 579 F. 3d at 639 (internal citation omitted). To overcome this presumption, a habeas petitioner must present record evidence that he or she somehow alerted the trial court to his or her desire to testify. *Id.* Shaykin points to no such evidence here.

Moreover, counsel's decision to present a defense by discrediting the prosecution witnesses was a reasonable trial strategy. Counsel indicated on the record that he did not plan to call Shaykin as a witness because Shaykin had admitted things in connection with the Ohio portion of the case that would have been "disastrous to this case." (R. 9-8, PID 746.) Avoiding calling Shaykin to the stand in favor of impeaching other witnesses, where Shaykin himself could have been subjected to impeachment, was reasonable. *See Varney v. Booker*, 506 F. App'x 362, 365–67 (6th Cir. 2012); *McCoy v. Jones*, 463 F. App'x 541, 548 (6th Cir. 2012). Shaykin says counsel should have moved to exclude those statements on the basis that the plea was made

pursuant to *North Carolina v. Alford*, 400 U.S. 25, 37 (1970), meaning that he pled guilty as an acknowledgement of the evidence the state possessed rather than as an admission of guilt. But Shaykin still could have been impeached with statements from his plea proceeding even if the conviction itself had not been introduced. *See* Mich. R. Evidence 410.

*Six.* Counsel was not ineffective for failing to play the voice recordings of Clark attempting to extort money from him. Clark admitted at trial that she attempted to extort money from Shaykin, and Oliver also mentioned in his testimony that he heard voice recordings to that effect. Plus, according to Detective Langford, the tape recording was not clear. It was reasonable to rely on Clark's own admission rather than risk confusing the jury with an unclear voice recording.

*Seven*. Counsel was not ineffective for failing to call a fingerprint expert to testify whether the knife had Shaykin's fingerprints on it. For one, the lack of fingerprints on the knife would not have necessarily exculpated Shaykin of the crime. Further, Shaykin gave Oliver and Snodderly gloves to wear so that they would not leave their fingerprints at the crime scene (R. 9-8, PID 697), and so it would have been reasonable for the jury to assume that Shaykin undertook similar precautions. Therefore, there was no reasonable probability that the outcome of trial would have been different if counsel had obtained such an expert.

*Eight*. Counsel was also not ineffective for failing to call Leo Sancrant to testify. Shaykin failed to attach any affidavit from Sancrant to his state court motion for relief from judgment, nor has he provided this Court with any affidavit from Sancrant concerning his proposed testimony and willingness to testify on the petitioner's behalf. Without any evidence of how Sancrant would have testified had he been called, the Court cannot say that counsel was ineffective for failing to call him. Conclusory allegations of ineffective assistance of counsel, without any

21

evidentiary support, do not provide a basis for habeas relief. *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998).

*Nine.* Lastly, counsel was not ineffective for failing to object when the prosecutor asked Detective Smith to offer an opinion as to the credibility of Oliver and Snodderly. When defense counsel focuses on some issues to the exclusion of others, there is a strong presumption that he or she did so for tactical reasons, rather than through sheer neglect. This presumption has particular force where an ineffective assistance of counsel claim is asserted by a federal habeas petitioner based solely on the trial record, where a reviewing court "may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive." *See Yarborough v. Gentry,* 540 U.S. 1, 5–6 (2003) (quoting *Massaro v. United States*, 538 U.S. 500, 505 (2003)). In the present case, counsel may very well have made a strategic decision not to object to Detective Smith's testimony, so as to avoid bringing undue attention to it. *See Cobb v. Perini,* 832 F.2d 342, 347–48 (6th Cir. 1987). Furthermore, as discussed thoroughly above, counsel had already impeached the credibility of those witnesses.

Overall, the Court believes there were valid reasons for trial counsel to proceed the way he did, and his approach was consistent with the arguments he presented in closing statements. Moreover, none of Shaykin's claims of ineffective assistance satisfy *Strickland*'s prejudice prong. Where the Michigan courts addressed trial counsel's performance, they did so under a reasonable application of *Strickland*. Accordingly, Shaykin is not entitled to habeas relief on the basis that his trial counsel was ineffective.

## C. Ineffective Assistance of Appellate Counsel

Shaykin argues that his appellate counsel was ineffective for failing to raise the above issues regarding trial counsel's performance.

Like most of his ineffective-assistance-of-trial-counsel claims, Shaykin raised these claims in his motion for relief from judgment in the Michigan courts. (R. 9-11.) Again, it appears these claims were never adjudicated on the merits. So the Court analyzes the claims *de novo*.

The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel on the first appeal by right. *Evitts v. Lucey*, 469 U.S. 387, 396-397 (1985). However, court appointed counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

As discussed, Shaykin's third through seventh claims of ineffective assistance of trial counsel are without merit. And "appellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'" *Shaneberger v. Jones*, 615 F. 3d 448, 452 (6th Cir. 2010)(quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)). Because none of these claims can be shown to be meritorious, appellate counsel was not ineffective in his handling of Shaykin's direct appeal. Shaykin is not entitled to habeas relief on his ineffective assistance of appellate counsel claim.

### D. Due Process Violation

Lastly, Shaykin claims that the trial court violated his due process rights when it failed to appoint a private investigator for his defense. Shaykin raised this claim in his motion for relief from judgment in the Michigan courts. (R. 9-11.) Again, it appears this claim was never adjudicated on the merits. So the Court applies *de novo* review.

It is true that "[i]ndigent prisoners are constitutionally entitled to 'the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners.'" *Mason v. Mitchell*, 320 F.3d 604, 615 (6th Cir. 2003). But the Supreme Court has held the denial of an investigator does not constitute a denial of due process giving rise to habeas relief where the

23

request was accompanied by "little more than undeveloped assertions that the requested assistance would be beneficial[.]" *Caldwell v. Misssissippi*, 472 U.S. 320, 323–24 n.1 (1985).

Here, it appears that the basis of the request was to discover information regarding "purchases of merchandise on the night of the alleged offenses, locating witnesses that the defendant had contact with on the night of the alleged offense," and "locating documented years where the alleged victim lived and was photographed and was found nude in." (R. 9-6, PID 516.) The trial court denied this motion because there was already a "complete investigative report." (R. 9-6, PID 517.) And, aside from helping him to impeach Oliver and Snodderly (an issue the Court has addressed), Shaykin fails to explain how an investigator would otherwise have been beneficial to his case. Therefore, the trial court's refusal to appoint a private investigator was not a violation of Shaykin's due process rights. He is not entitled to habeas relief on this claim.

## V. CONCLUSION

For the reasons set forth above, the Court will not grant Shaykin the relief requested in his Petition. The Court also believes that no reasonable jurist would find that Shaykin's claims have merit, so a certificate of appealability will not issue from this Court. *See Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). But if Shaykin nonetheless chooses to appeal, he may proceed *in forma pauperis*. *See* 28 U.S.C. § 1915(a)(3).

Accordingly, IT IS ORDERED that the Motion to Expand the Record (R. 23) is GRANTED IN PART.

It is further ORDERED that the Motion to Produce Rule 5 Materials (R. 22) is DENIED.

It is further ORDERED that the Petition for Writ of Habeas Corpus (R. 1) is DENIED.

It is further ORDERED that a Certificate of Appealability is DENIED.

It is further ORDERED that Petitioner may proceed *in forma pauperis* on appeal.

24

SO ORDERED.

                                          s/Laurie J. Michelson
                                          LAURIE J. MICHELSON
Dated: January 6, 2017                    U.S. DISTRICT JUDGE


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 6, 2017.

                                          s/Keisha Jackson
                                          Case Manager